IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 4, 2019

IN RE EMMA S.

Appeal from the Juvenile Court for Hamilton County
No. 283144   Robert D. Philyaw, Judge

_____

No. E2019-00718-COA-R3-PT

_____

In this parental termination case, the juvenile court found two statutory grounds for termination of a mother's parental rights: substantial noncompliance with the requirements of the permanency plan and persistence of conditions.  The juvenile court also found that termination of the mother's parental rights was in her child's best interest. Because the record contains clear and convincing evidence to support the grounds for termination and the best interest determination, we affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and J. STEVEN STAFFORD, P.J., W.S., joined.

David C. Veazey, Chattanooga, Tennessee, for the appellant, Haley S.

Herbert H. Slatery II, Attorney General and Reporter, and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Raymond A. Neal, Chattanooga, Tennessee, Guardian ad Litem for Emma S.

OPINION

I.

A.

The Tennessee Department of Children's Services ("DCS") first became involved with Haley S. ("Mother") when she lost custody of her older child in 2015.  The child

was taken from her when he was ten months old. Although the child had multiple fractures in various stages of healing, Mother claimed that she did not know the child was being hurt. According to Mother, the child's father, Geard R. ("Father"), was responsible for the child's injuries. And ultimately, Father pled guilty to aggravated child abuse. In 2016, both Mother and Father surrendered their parental rights to the child.

A couple of months after the surrender, Mother gave birth to Emma, her second child with Father. Emma was just a little over one year old when DCS placed her in protective custody following a referral alleging lack of supervision and environmental neglect.

At the time, Father was still serving his prison sentence for aggravated child abuse. Mother, along with her paramour and Emma, lived in the home of Mother's great aunt. When DCS arrived at the home accompanied by the police, Mother, her paramour, and her great aunt were standing outside; the one-year-old child was in the house unattended. The DCS investigator described deplorable conditions within the home. Roaches were "crawling on the child, the counters, the walls, the floor, and the furniture." And there were animal feces on the floors.

An examination of Emma revealed bruising on Emma's forehead on the right side and fresh bruising on her cheek with an outline in the shape of fingers. When Emma was later taken to the hospital, they found additional bruising on the child's back. During an interview, Mother denied hurting Emma; much later Mother explained that the child was learning to walk and "had a couple of bruises on her face from where she had fell [sic] a couple of times trying to walk." She guessed her paramour, who she claimed was watching the child, just "wasn't quick enough to get to her."

During her interview at the scene, Mother also disclosed that she and her paramour had smoked marijuana in the home while Emma was present about two hours before DCS arrived. Unsurprisingly, Mother and her paramour both tested positive for marijuana. Emma tested positive for exposure to methamphetamine and marijuana. The police arrested Mother and her paramour, charging them with drug possession, possession of drug paraphernalia, and felony child neglect.

On July 31, 2017, in the Juvenile Court for Hamilton County, DCS petitioned for temporary legal custody of Emma. Mother waived the adjudicatory hearing and stipulated that Emma was dependent and neglected. The court found clear and convincing evidence that Mother was unable to provide a safe and stable home environment.

On August 14, 2017, DCS created a permanency plan with Mother's participation. The initial goal of the plan was returning Emma to Mother provided that the court did not make a finding of severe abuse. In addition to Mother's substance abuse problems, the

2

plan addressed Mother's mental health, parenting skills, and lack of sufficient resources to provide for Emma. Among other things, the plan required Mother to (1) participate in a mental health assessment and follow the recommendations; (2) maintain contact with DCS; (3) pay child support if ordered; (4) become financially stable and provide proof of legal income; (5) attend and actively participate in visits with Emma; (6) participate in an alcohol and drug assessment and follow the recommendations; (7) submit to random drug screens; (8) refrain from associating with individuals who are known to use illegal substances; and (9) obtain and maintain housing for at least six consecutive months. DCS revised the plan twice, but Mother's responsibilities remained largely the same.

B.

On June 7, 2018, DCS petitioned to terminate Mother's parental rights.[1] The petition alleged three grounds for termination: abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistent conditions. The juvenile court conducted a trial over two days in which Mother, the DCS family services worker (the "FSW"), and Emma's foster mother ("Foster Mother") testified.

The testimony revealed that Mother had made little progress on the housing front. During the year and a half between Emma's removal and the trial, Mother lived with her ex-boyfriend's parents and then on her own in an apartment in Cleveland, Tennessee. The FSW had to arrange for a visit of the apartment through the landlord, who requested to meet with the FSW in private. During that meeting, the landlord communicated several concerns, including Mother's frequent male visitors. When the FSW arrived at Mother's apartment, the FSW found three men there. The landlord also expressed concern about a bedbug infestation and cautioned the FSW not to sit down or touch anything in Mother's apartment.

The landlord evicted Mother after only three or four months for failure to pay rent and having too many visitors in the apartment. Although the apartment was in low income housing and rent was based on income, Mother explained that, when her hours were reduced at the fast food restaurant where she was working, she could not get her boss to give her proof of the reduction of her hours, so she was unable to get her rent adjusted.

After Mother's eviction, the FSW assisted Mother with the completion of an application with the local housing authority. An appointment with the housing authority was set up, but Mother missed the appointment.

---

[1] DCS also petitioned to terminate Father's parental rights, but during the course of the trial, he agreed to surrender his parental rights to Emma.

At trial and for the eight-month period leading up to it, Mother was again living at the home of her great aunt, the place she lived when Emma was removed. Mother acknowledged that, when Emma was removed, the home "was awful" and that she "was embarrassed" for anyone to come in. But she claimed that the conditions had improved since then. Still, Mother conceded there was more work to do:

> Now I've got it to where I've just about got the house completely finished. I've got a few places in the wall that I need to fix and a few places in the floor that needs [sic] to be fixed. There's not no [sic] feces or dog pee laying [sic] in the floor no more. The house is cleaned up. We still have a little bit of a bug problem, but by my next check, I plan on getting a little bug bomb and bombing the house to get rid of the bugs.

The FSW, however, had not been permitted into the home. According to Mother, her great aunt did not want anyone in, but Mother was trying to convince her great aunt to allow an inspection.

Mother also continued to struggle with drug use. Her initial drug screen was positive for methamphetamine, tetrahydrocannabinol ("THC"), and benzodiazepines. In September and November of 2017, Mother had negative drug screens. But in February, July, September, and December of 2018, she tested positive for THC, the psychoactive element of marijuana. For her part, Mother denied smoking marijuana; she theorized that "maybe me standing too close to someone while they're smoking, maybe it could have got [sic] into my system like that."

In addition to concerns over housing and drug use, the FSW testified to her frustrations with Mother's lack of compliance with the requirements of the permanency plans. According to the FSW, Mother was no closer to being reunified with Emma than when the FSW was first assigned the case, a few months after Emma's removal. The FSW complained that she would assist Mother with setting up appointments, filling out applications, or identifying simple tasks to complete, but Mother would not follow through. Mother claimed that, for the most part, she had tried to meet the FSW halfway. But she also admitted that several requirements of the plans had not been fulfilled.

Since her removal, Emma had been with the same foster family. By the trial date, the child was almost three. Both the FSW and Foster Mother testified to the strong bond Emma had developed with her foster parents and their four-year-old son. Emma called the foster parents "Momma" and "Papa." And Emma and the son played together and often held hands across their car seats on the way home from school. Foster Mother testified that her family would like to adopt Emma.

Foster Mother spent much of her testimony describing Emma's medical conditions. When the child was placed in their home, the foster parents realized that

4

Emma was still spitting up a great deal for a 14-month-old child. They took her to the doctor, and after several tests, she was diagnosed with gastroperesis, which is delayed stomach emptying. In addition to gastroperesis, Emma experiences rumination,[2] has reflux, and aspirates her food.

As part of her medical care, Emma makes frequent doctor visits, averaging between one and four each month. She sees a pediatric gastroenterologist every three to six months. And she sees a pulmonologist for the aspiration. Foster Mother estimated that they had taken Emma to more than 100 medical appointments since the child came into their care.

In addition to her medical appointments, the child must have therapy to address her medical and other circumstances. She has feeding therapy every other week and has physical therapy the weeks she does not have feeding therapy. Emma also participates in an in-home educational program twice a month to address developmental delays.

Foster Mother explained that Emma must have constant supervision. Every meal or snack brings the potential for something to get stuck in Emma's throat or for her to cough up the food. Because of her aspiration issues, Emma's liquids must be thickened to the consistency of honey. When she drinks, Emma must tuck her chin and cough every three or four swallows. The Foster Mother described every meal as "a therapy session."

## C.

The juvenile court terminated Mother's parental rights. The court found that DCS had proven two statutory grounds for termination: substantial noncompliance with the permanency plan and persistent conditions.[3] With respect to the permanency plan, the court found that the plan requirements were reasonably related to the reasons that necessitated Emma's entry into foster care. The court also found that DCS had made reasonable efforts to assist Mother. But Mother had "made little progress on the permanency plan since the child entered foster care, with the exception of resolving her legal issues, not accruing new criminal charges, maintaining contact with [DCS], paying some child support, and submitting to some random drug screens."

As for persistence of conditions, the court noted that Emma had been removed from Mother's custody for more than 6 months and that her removal was due to "drug abuse, physical abuse, and environmental neglect." The court found that Mother

---

[2] Rumination is "[r]egurgitation . . . with rechewing[] of previously swallowed food." *Rumination*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

[3] At the conclusion of the proof, DCS dismissed its claim that Mother had abandoned her child by failure to provide a suitable home.

"continued to struggle with substance abuse" and had "failed to maintain stable housing." The court also found that there was little chance that those conditions would be remedied soon and that continuation of the parental relationship between Mother and Emma would greatly diminish the child's chances of being placed into a safe, stable, and permanent home.

The court further determined that termination of Mother's parental rights was in Emma's best interest. The court found that each statutory best interest factor it examined favored terminating parental rights.

**II.**

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those circumstances in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

6

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

Mother argues that the evidence does not clearly and convincingly support either statutory ground relied on by the juvenile court for terminating her parental rights. Mother also argues that the evidence does not clearly and convincingly support the finding that termination of her parental rights was in the best interest of Emma.

1. Substantial Noncompliance

The juvenile court found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements were "reasonable and are related to remedying the conditions that necessitate foster care placement." *Id.* § 37-2-403(a)(2)(C) (Supp. 2019). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the permanency plan requirements were reasonable and related to remedying the conditions that led to Emma's removal and that prevented reunification. Emma entered foster care due to child abuse and neglect, Mother's drug use, and the condition of the home where they lived. To address these issues, the permanency plan required Mother to complete an alcohol and drug assessment and follow the recommendations; complete a mental health assessment and follow the recommendations; refrain from associating with individuals who are known to use drugs; maintain appropriate housing for six months; pay child support; and participate in regular visits with the child.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts

to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

The evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plan. Mother never completed her alcohol and drug treatment or her mental health treatment. She completed initial assessments. But she was discharged twice from the alcohol and drug treatment for non-compliance, and she did not attend any mental health appointments after her initial assessment. She failed four drug screens, one within three months of the trial.

Appropriate housing remains an issue. Mother was evicted from her apartment for failure to pay rent and because of the number of male visitors. She has returned to the home where she was living when Emma was removed. Although Mother stated she has worked to improve the condition of the home, she acknowledged that there were still deficiencies. DCS has not been allowed to inspect the home to see if it is an appropriate environment. And Mother admitted that her own mother lives in the home and regularly smokes marijuana.

Mother has not demonstrated that she has the ability to care for Emma. As of the trial date, Mother had only made seven child support payments. She only began making payment within a few months of the trial. When asked why it took her so long to begin paying support, Mother testified "[b]ecause I was having trouble getting by." The evidence supports the court's finding that Mother struggles to support herself and lacks the capability to support a child with special medical needs.

Mother also failed to maintain regular visitation. Mother had the opportunity for 32 visits with Emma, but she only attended 13. And Mother did not attend any of Emma's many medical appointments or treatments.

2. Persistence of Conditions

The juvenile court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood

that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. When the termination petition was filed, the ground applied as a basis to terminate parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
> (C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[4]   Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

This record contains clear and convincing evidence that the conditions preventing the child's safe return persist. As noted above, Mother still lacks an appropriate home and has not prioritized her drug or mental health treatment. The court found that Mother lived "in a home where drug abuse is ongoing and [Mother] herself continues to abuse drugs." The court clearly did not credit Mother's denial of drug use. We give great weight to this credibility determination. *See In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016).

We further conclude that the evidence was clear and convincing that there was little likelihood that these conditions would be remedied in the near future. While Mother says that she needs just a few more months to get things on track, the fact that she had already had a year and a half and had made little to no progress makes reunification "in the near future" unlikely.

Finally, we conclude that continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent

---

[4] In 2018, the Legislature made significant changes to the persistence of conditions ground for termination. 2018 Tenn. Pub. Acts 1088, 1089 (ch. 875 § 10).

home. At the time of trial, Emma had been living with her foster family for 19 months. She had bonded with her foster family, who provide a safe and stable home. Mother, on the other hand, remains unable to provide either.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. The analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering the statutory factors, the juvenile court determined that termination of parental rights was in Emma's best interest. The court emphasized Mother's failure to make lasting changes in her lifestyle or conduct, failure to maintain regular visitation, the detrimental effect of a change in caretakers, including the effect on Emma's medical treatment, and the abuse of drugs in Mother's home.

The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not

10

reasonably appear possible"). We agree that Mother has not made a lasting change. Mother has returned to a home that, by her own admission, is still not a suitable environment for Emma. Mother also continues to abuse drugs, and she has been unable to complete treatment for her drug problems.

The third and fourth factors concern the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found Mother had not maintained regular visitation and did not have a relationship with Emma. Mother did not even attend half of her potential visits with Emma. Foster Mother testified that Emma does not like to go on the visits with Mother.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The juvenile court found a change in caregivers would be detrimental, in part because of Emma's extensive medical needs. Mother acknowledged a transition would be difficult. Mother had been unable to attend any of Emma's therapy or medical appointments. Emma was removed from Mother's custody when she was less than two years old. At the time of trial, she had lived with the same foster family for a year and a half. She had bonded with the family, who had provided the only safe and stable home she had ever known. And the foster parents want to adopt Emma.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). When Emma was taken into custody she had signs of physical abuse, and she also tested positive for both marijuana and methamphetamine.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The trial court found that there was crime in the home. The court also found that Mother continues to engage in illegal drug use, as evidenced by her failed drug screens.

The ninth factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). The juvenile court did not address this factor, but Mother had not paid child support as ordered. She only commenced payments shortly before the trial of the case.

11

We agree with the juvenile court that the combined weight of the proven facts amount to clear and convincing evidence that termination is in Emma's best interest. All of the statutory best interest factors favor termination.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on the grounds of substantial noncompliance with the requirements of the permanency plan and persistence of conditions. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating Mother's parental rights.

_____

W. NEAL MᴄBRAYER, JUDGE

.